Filed 5/27/25

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION, | C099467 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UBT-2015-0002249) |
| v. | |
| PROGRESSIVE CASUALTY INSURANCE COMPANY, | |
| Defendant and Respondent. | |

     APPEAL from a judgment of the Superior Court of San Joaquin County, Robert T. Waters, Judge. Affirmed.

     HPS Associates, Arthur R. Petrie, II, John A. McMahon; Law Offices of Steven B. Simon and Michael S. Mischel for Plaintiff and Appellant.

     Hinshaw & Culbertson, Min Kyong Kang, David T. Hayek and R. Wardell Loveland for Defendant and Respondent.


SUMMARY OF THE APPEAL

     M.G. receives health care coverage through Medi-Cal. After she suffered injuries in an automobile accident, M.G. received emergency and ongoing medical care from plaintiff and appellant Dameron Hospital Association (Dameron). Dameron requires patients or their family members to sign conditions of admissions (COAs) when Dameron provides the patients' emergency medical care. The COAs contain an assignment of benefits (AOB) with language that assigns to Dameron direct payment of uninsured and

1

underinsured motorist (UM) benefits that would otherwise be payable to those patients under their automobile insurance policies.

Here, M.G.'s policy with defendant and respondent Progressive Casualty Insurance Company (Progressive) included UM coverage, and Dameron sought to collect payment for M.G.'s treatment directly from Progressive out of her UM benefits at rates above the rates Medi-Cal would pay. Progressive did not pay Dameron and settled a claim to collect UM benefits with M.G. Dameron sued Progressive seeking damages, an injunction that enjoins Progressive from ignoring the AOB, and declaratory relief holding that the AOB is enforceable.

While this case was pending, this court issued a decision in *Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2022) 77 Cal.App.5th 971 (*Dameron v. AAA*). In *Dameron v. AAA* we found, among other things, the COA forms at issue here are contracts of adhesion and the AOBs are unenforceable because "it is not within the reasonable possible expectations of patients that a hospital would collect payments for emergency care directly out of their UM benefits." (*Id.* at p. 978.)

Applying our decision in *Dameron v. AAA*, the trial court sustained a demurrer to the operative complaint in this action without leave to amend. The trial court found the action barred by collateral estoppel. The trial court also found that even if collateral estoppel were not to apply, multiple holdings and the reasoning in *Dameron v. AAA* required it to sustain the demurrer.

On appeal, Dameron argues that because M.G. had Medi-Cal insurance, a fact-pattern not considered in *Dameron v. AAA*, the trial court improperly found collateral estoppel applied. Dameron also argues that, given the statutes and regulations governing Medi-Cal coverage, the reasoning we applied in *Dameron v. AAA* does not otherwise support the trial court's ruling here.

We conclude that under the reasoning we applied in *Dameron v. AAA* (1) the COAs remain contracts of adhesion; (2) it is not within the reasonable expectation of a

2

Medi-Cal patient that a COA will contain an assignment of UM benefits to the facility providing him or her with emergency care, particularly an assignment that allows the hospital to collect its full bill without ever presenting a bill to Medi-Cal; and (3) that, therefore, the AOB contained in the COA was unenforceable. Given this finding, we need not consider arguments regarding collateral estoppel or the import of the Knox-Keene Health Care Service Plan Act of 1975 (Health & Saf. Code, §§ 1340-1399.874 (Knox-Keene)).

We affirm the trial court's order sustaining the demurrer and the judgment.

Respondent's motion to strike exhibits to the appellant's reply brief and sections of the brief that cite to those exhibits is denied.

## FACTS AND HISTORY OF THE PROCEEDINGS

A.     The Complaint

According to the first amended complaint (complaint) Dameron operates a hospital in California. Progressive markets and provides insurance policies in California. M.G. has a UM policy with Progressive.

Dameron provided emergency and ongoing medical services to M.G. after she was injured in a car accident.

M.G. or her representative signed Dameron's COA before her discharge. The AOB says, "[t]he undersigned (for him or herself and the patient) assigns to the hospital, and to the physician(s), and to the other health care professionals providing services to the patient during this hospitalization (or on an outpatient basis) all insurance benefits of any kind that are, or that might be owed, or otherwise due for hospital and/or health care services of any kind provided to the patient. This assignment includes, but is not limited to, all health plan and health insurance benefits, all medical payments coverage under any policy of insurance, and all uninsured and underinsured motorist insurance benefits payable to or on behalf of the patient. [¶] The undersigned (for him or herself and the

3

patient) authorizes direct payment to the hospital (and to and [*sic*] the physicians specifically associated with the patient's medical care, and to any other health care professionals specifically associated with the patient's medical care) of any insurance benefits otherwise payable to or on behalf of the patient and/or the undersigned for this hospitalization, or for outpatient services or outpatient observation care, and for any emergency services rendered, at a rate not to exceed the hospital's physician's, or health care professional's regular billed charges."

Dameron served Progressive with written notice that M.G. had assigned Dameron all benefits due for hospital services under the UM policy covering M.G. Though not plainly stated in the complaint, based on Dameron's briefing here, Dameron billed Progressive for an amount that was greater than it could have collected under Medi-Cal rates.

M.G. made a claim with Progressive which included medical bills incurred by M.G. for her treatment with Dameron. After Dameron served Progressive with the notice of assignment, Progressive entered a lump sum settlement with M.G., "which may or may not include [M.G.'s] 'promise' to pay [Dameron's] hospital bill from the proceeds of the settlement." Progressive paid M.G. (or a third party that was not Dameron) money Dameron believes was due Dameron.

Progressive ignored the AOB. Neither M.G. nor a third party paid by Progressive ever remitted any money to Dameron. Dameron asserts Progressive owes Dameron $2,686.75 on M.G.'s account.

Dameron did not bill Medi-Cal for M.G.'s treatment.

B.     Procedural History

Dameron filed the original complaint in this action on March 12, 2015. The first cause of action alleged Progressive had engaged in unfair business practices under Business and Professions Code section 17200, et seq. because it ignored what Dameron

4

maintains is a "lawful and enforceable" AOB. The second cause of action alleged a breach of contract by virtue of Progressive violating the AOB contained in the COA. The original complaint made no allegations regarding the import of M.G.'s status as a Medi-Cal beneficiary.

In January 2018, the trial court entered a stipulated order that stayed the action pending this court's consideration of three appeals the parties identified as related to this action, which we will refer to collectively as the 2022 Dameron Cases: *Dameron Hospital Association v. AAA Northern California, Nevada & Utah Insurance Exchange*, Known as CSAA Insurance Exchange (case No. C086518; the AAA Case); *Dameron Hospital Association v. Geico Casualty Company* (case No. C086546); and *Dameron Hospital Association v. United Services Automobile Association* (case No. C087225). According to the stipulated order, the resolution of the appeals in the 2022 Dameron Cases was "likely [to] control and/or guide substantial portions, if not all, of this and a number of related cases."

In April 2022, this court issued its decisions in the 2022 Dameron Cases, publishing the decision in the AAA Case. (See *Dameron v. AAA*, *supra*, 77 Cal.App.5th 971.) In the AAA Case, this court considered, among other scenarios, (1) the enforceability of the AOB when a patient with private healthcare insurance had UM coverage (*id.* at p. 983, et seq.); and (2) the enforceability of the AOB when the patient presumably did not have health insurance (*id.* at p. 991, et seq.). This court found, "(1) the COA forms are contracts of adhesion; [and] (2) it is not within the reasonable possible expectations of patients that a hospital would collect payments for emergency care directly out of their UM benefits." (*Id.* at p. 978.) We also found that an assignment of UM benefits could not stand when the patient had private health insurance because it violated policies reflected in Knox-Keene. (*Id.* at p. 983.)

The trial court lifted the stay in this action in July 2022.

5

In January 2023 Progressive filed a motion for summary judgment or adjudication based on the original complaint. In the memorandum defendant filed in support of the motion for summary judgment, defendant stated the complaint in the AAA Case was "virtually identical" to the original complaint in this case, and quoted *Dameron v. AAA*'s language that states, "Dameron cannot collect payment for emergency services from the UM . . . benefits due to patients [who] were covered under health insurance."

In opposing the motion for summary judgment, Dameron argued the *Dameron v. AAA* decision was not operative here, because the decision was based on patients with private insurance plans governed by the Knox-Keene, and Medi-Cal/Medicare plans are governed under a different set of standards and policies. In its reply to the opposition, Progressive argued that plaintiff's arguments regarding Medi-Cal/Medicare were a distraction, because Dameron had made no claims in the original complaint that were tied to the fact that M.G. was a Medi-Cal recipient.

Following a hearing on the motion for summary judgment, the trial court issued a minute order allowing Dameron to amend its complaint.

Dameron filed the operative complaint, in April 2023. The operative complaint, unlike the original complaint, alleges M.G. is a Medi-Cal beneficiary. The operative complaint also specifies that its scope was limited to "violations" by Progressive with respect to patients who either lack health insurance coverage "other than automobile insurance" or have government payor coverage. The operative complaint maintains that, with respect to government-funded health care coverage, federal and state laws dictate that UM is a primary payor to the government funded program, and, therefore, that UM must be used to pay hospitals for a government beneficiary's care before the government-funded program is used. Like the original complaint, the operative complaint alleges (1) that Progressive has committed unlawful and unfair business practices by choosing to ignore what Dameron claims are "lawful and enforceable AOB claims"; and (2) that

6

Progressive has violated an enforceable AOB. Thus, both causes of action rely on the underlying assumption that the AOBs are enforceable with respect to UM benefits.

Dameron seeks relief permanently enjoining Progressive from "ignoring and violating AOBs" given to Dameron by their patients, a declaration of rights under the AOB, and damages for funds due under the AOBs.

Progressive demurred to the operative complaint. In its opening memorandum in support of the demurrer, Progressive argued that, given *Dameron v. AAA*, it was not within M.G.'s reasonable expectations that she would assign her UM benefits to plaintiff in the COA. In its opposition to the demurrer, Dameron argued it was within the patient's reasonable expectation that its UM benefits would be assigned to pay Dameron because, under governing laws, Medi-Cal is a payor of last resort and the UM coverage M.G. had would be a primary payor. In reply, Progressive argued that an expectation a patient might have that Medi-Cal might have a lien to collect its reduced rates from a patient "does not mean that a patient should somehow expect that Dameron would be entitled to collect their personal UM benefits to satisfy the hospital's full-rate emergency department bills."

In a thorough tentative ruling issued the day before the hearing on the demurrer, the trial court stated its intent to sustain the demurrer to the operative complaint without leave to amend. Notably, the court wrote that, "Dameron v. AAA found the AOB, the very same AOB at issue in this case, unenforceable to assign emergency patients' UM coverage—whether they had medical insurance or not. It simply is not within the reasonable expectation of a patient to have to assign UM coverage for emergency medical care, even more so when the patient has health care coverage to address medical treatment. [¶] The AOB at issue here, and avoidance of available Medi-Cal coverage is also unconscionable when one considers that [M.G.'s] UM insurance was her only source of recovery for the accident and had to cover injuries and their impact on her, including general damages and lost wages." The trial court also provided a thorough response to

7

Dameron's suggestion that M.G. should have expected her UM benefits to be assigned to Dameron. In proffering this explanation, the court cited *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798 (*Olszewski*) and *Palumbo v. Myers* (1983) 149 Cal.App.3d 1020 (*Palumbo*), and various statutes that govern when hospitals must submit claims to Medi-Cal and how Medi-Cal patients assign UM benefits to Medi-Cal.

Following the hearing, the trial court entered an order adopting its tentative ruling and entered judgment dismissing the action. Plaintiff timely filed this appeal. (Cal. Rules of Court, rule 8.104(a).)

DISCUSSION

I

*Standard of Review*

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend, our standard of review is de novo, i.e., we exercise our independent judgment about whether the complaint alleges facts sufficient to state a cause of action under any possible legal theory. [Citations.] ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 []; see *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [].)" (*Moe v. Anderson* (2012) 207 Cal.App.4th 826, 830-831 (*Moe*).)

" 'The judgment must be affirmed "if any one of the several grounds of demurrer is well taken. [Citations.]" [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. . . .' (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 []; [citation].)" (*Moe, supra*, 207 Cal.App.4th at p. 831.)

8

We also note "a fundamental principle of appellate procedure [is] that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment."  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; see also *Williams v. Sacramento River Cats Baseball Club, LLC* (2019) 40 Cal.App.5th 280, 286.)

Each argument made in an appellate brief must be "under a separate heading or subheading summarizing the point," and each point must be supported "by argument and, if possible, by citation of authority."  (Cal. Rules of Court, rule 8.204(a)(1)(B).)  When a party fails to place an argument under a proper heading or subheading, we need not consider the issue.  (See *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 542; *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726.)

Here, none of Dameron's headings specifically mention the import of contracts of adhesion or what the reasonable expectations of a Medi-Cal recipient should be with respect to a hospital's billing practices and collection efforts.  One header simply reads "other relevant Medicare/Medicaid law" (all caps removed) without specifying how that law is relevant here.  To the extent this court does not identify or discuss Dameron's arguments regarding reasonable expectations of Medi-Cal patients with UM coverage, that is because Dameron has failed to sufficiently frame or provide the argument.

II

*The AOB is an Unenforceable Contract of Adhesion*

A.    The Purposes of Uninsured Motorist Coverage

As we explained in *Dameron v. AAA*, *supra*, 77 Cal.App.5th 971:  "UM policies are governed generally by Insurance Code section 11580.2, 'which requires automobile liability insurers to offer insurance for damages or wrongful death caused by both uninsured and underinsured motorists.' (*Quintano v. Mercury Casualty Co.* (1995)

9

11 Cal.4th 1049, 1053 []; see also Ins. Code, § 11580.2, subds. (a)(1), (p)(7).)" (*Dameron v. AAA*, at p. 987.)

"Though UM policies exist to assure persons injured in automobile accidents a minimum level of payment when their injuries are the fault of uninsured or underinsured motorists, . . . . UM policies, ' "are not 'third party' coverages. They are strictly 'first party' coverages because the insurer's duty is to compensate its own insured for his or her losses, rather than to indemnify against liability claims from others." ' (*Weston* [*Reid, LLC v. American Ins. Group, Inc.* (2009)] 174 Cal.App.4th [940] 950, italics omitted.)" (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at p. 987.) "When a medical care provider pursues a patient's UM . . . benefits . . . they are" going after a portion of "a capped amount of funds that are intended to compensate the patient for the patient's losses and expenses." (*Id.* at p. 988.)

B.    <u>Assignment</u> of <u>UM</u> <u>Benefits</u> <u>in</u> the <u>AOB</u> <u>are</u> <u>Unenforceable</u>

*Dameron v. AAA* informs our analysis here. " 'The term "adhesion contract" refers to standardized contract forms offered to consumers of goods and services on essentially a "take it or leave it" basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the form contract.' (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 356 [] (*Wheeler*).) 'The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms. [Citations.] [¶] A hospital's standard printed "Conditions of Admission" form possesses all the characteristics of a contract of adhesion. [Citations.] As the court stated in *Tunkl v. Regents of University of California* [(1963)] 60 Cal.2d [92,] 102 []: "The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the

terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. . . .” ’ (*Wheeler*, 63 Cal.App.3d at pp. 356-357.)” (*Dameron v. AAA*, *supra*, 77 Cal.App.5th pp. 992-993.) The COA here is a contract of adhesion. (*Id.* at p. 993.)

“With contracts of adhesion, ‘[e]nforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. “ ‘In dealing with standardized contracts, courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser’s “calling” and to what extent the stronger party disappointed reasonable expectations based on the typical life situation.’ ” [Citations.]’ (*Wheeler*, *supra*, 63 Cal.App.3d at p. 356.)” (*Dameron v. AAA*, *supra*, 77 Cal.App.5th p. 993.)

In *AAA v. Dameron*, *supra*, 77 Cal.App.5th at page 994, we explained with respect to a patient where it was unknown if the patient had medical insurance that, “persons with UM policies expect benefits to be paid directly to them to compensate them for their bodily injuries. It simply isn’t within the reasonable expectation of a patient to expect it will be made to assign its UM benefits under an automobile insurance policy.” While we may have stressed this was “*particularly* true” when a patient also had a policy through their automobile insurer that was designed to cover medical payments (Med-Pay coverage), that does not change the fact that it is also true for patients that only have UM coverage. (See *ibid.*, italics added.)

Our finding regarding the assignability of UM coverage in a COA contrasts with our finding that a patient without other health insurance *might* expect their Med-Pay coverage to be assigned to Dameron in the AOB. (*AAA v. Dameron*, *supra*, 77 Cal.App.5th at p. 978 [stating hospitals can’t collect Med-Pay or UM benefits due to patients with health insurance policies, and then making a broader statement that patients would not expect direct collection of UM benefits by hospitals without stating the

11

holding applied to insured patients]; see also *id.* at p. 994.)  With respect to UM coverage, a lack of health insurance coverage did not convert the assignment of UM benefits to something the patient would reasonably expect in the COA.  (See *ibid.*)  Also, here, though M.G. may not have had Med-Pay coverage, unlike the patient whose UM coverage was addressed in the adhesion analysis in *Dameron v. AAA* who possibly lacked a source to pay for healthcare coverage that was not part of an auto insurance policy, the complaint asserts that M.G. did have healthcare coverage in the form of Medi-Cal.  "Patients with medical insurance coverage expect that coverage will 'insulate [them] from any monetary obligation for such medical care.'  (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 705 [].)"  (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at p. 988.)  We believe the same is true for patients with Medi-Cal coverage, regardless of whether you label that coverage "insurance" or not.

C.   Dameron's Efforts to Avoid *Dameron v. AAA* are Unpersuasive

Dameron attempts to avoid our holding in *Dameron v. AAA* in three overlapping ways.  First, Dameron mischaracterizes our holding regarding the reasonable expectations of patients when it comes to the assignment of their UM benefits in COAs by citing portions of the decision without providing sufficient context.  Second, they argue that due to federal and state statutes and regulations that govern Medi-Cal, Medi-Cal beneficiaries should reasonably expect a hospital would seek to collect direct payments from a patient's UM provider.  Finally, they suggest Progressive's description of UM coverage shows M.G. should have expected Dameron to seek remuneration from M.G.'s UM coverage.

1.   Mischaracterizations of *Dameron v. AAA*

In the first paragraph of its opening brief, Dameron writes that in *Dameron v. AAA* "this court determined that [Dameron] could proceed with a collection action against an automobile ('auto') insurance company based on a patient [AOB] to Dameron so long as

12

the patient would reasonably expect to have assigned the relevant auto insurance benefits to Dameron. . . . The Court found there was no such expectation for first-party Med-Pay or [UM] Coverage where the patient held private health insurance governed by the Knox-Keene Health Act, Health & Saf. Code ('HSC') §§ 1340-1399.864 (i.e., private health insurance). ([*Dameron v. AAA*, *supra*, 77 Cal.App.5th at p.] 989.)"

As an initial matter, the page Dameron cites to support this proposition says nothing about the reasonable expectations of a party signing a COA. (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at p. 989.) The text on that page deals with the import of a factual scenario in which the individual who signed the COA for a minor was not the policy holder of the subject auto insurance. (*Ibid.*)

We suspect the portion of the *Dameron v. AAA* decision to which Dameron refers is the prior page of the decision, in which this court explained why, as a policy matter, based on Knox-Keene provisions, hospitals cannot pursue patients' UM benefits to secure their full bills for services (a process referred to as balance billing) when those patients have insurance policies governed by Knox-Keene. (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at p. 988.) While the expectations of patients to be insulated from having to pay for their medical bills when they have insurance factored into the analysis in that part of *Dameron v. AAA*, the part of *Dameron v. AAA* that most depended on patient's reasonable expectations follows a separate path of analysis and is not limited to patients with private insurance. (See *id.* at pp. 993-995.)

As discussed above, whether an assignment of UM benefits would fall within the reasonable expectations of a patient, had the most import in the discussion regarding whether the AOB was an impermissible contract of adhesion as applied to a patient where it was unknown if they had health insurance at all. (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at pp. 993-995.) That is, while in the portion of the decision regarding patients with private health insurance the court may have stated it was not within their expectations to pay for their medical care (beyond what they were obligated to pay

through their medical insurance carrier), when the court found it was not in the reasonable expectations of a patient to assign UM benefits in a COA, it made that finding without respect to the nature of the patients' healthcare coverage.

Later in the opening brief, when addressing the issue of collateral estoppel—and therefore when addressing the applicability of *Dameron v. AAA*'s holdings to this case— Dameron writes that in *Dameron v. AAA* this court "indicated that its decision might change if Dameron had timely presented that the managed care at issue was part of a federally regulated plan under the Employee Retirement Income Security Act of 1974 (ERISA; 29 U.S.C. 1001, et seq.). It follows that if the Court's position might have changed if it considered ERISA implications, the Court's position also might have changed if it considered [Medi-Cal] implications."

Again, Dameron appears to have erred in providing a pinpoint citation to our decision when identifying where we discussed ERISA. (*Dameron v. AAA*, *supra*, 77 Cal.App.5th at pp. 996-997.) The portion of our decision in which we refer to Dameron's ERISA argument in *Dameron v. AAA* states that Dameron made the ERISA argument regarding a patient whose *med-pay* benefits Dameron had sought even though he had insurance that was governed by Knox-Keene. (See *id.* at pp. 983-985, 997.) That is, the portion of the decision at issue was not about UM benefits and was not centered in the reasonable expectations of the subject patient. Additionally, in our decision we did not say our decision "might change" if Dameron had made its argument earlier. We simply said Dameron had forfeited any argument on the ERISA issue by failing to timely raise it. As written, Dameron's brief overstates the import of our discussion of the ERISA issue.

### 2. Medi-Cal Laws on Priority of Payments do not Change the Result

"Medi-Cal is California's program under the joint federal-state program known as Medicaid. (Welf. & Inst. Code, § 14000 et seq.) Medicaid provides federal financial

14

assistance to participating states to support the provision of health care services to certain categories of low-income individuals and families, including the aged, blind, and disabled, as well as pregnant women and others. (42 U.S.C. § 1396 et seq.)" (*Marquez v. State Dept. of Health Care Services* (2015) 240 Cal.App.4th 87, 93 (*Marquez*).) Medi-Cal is administered by the Department of Healthcare Services (DHCS). (*Id.* at p. 94.)

"Because California has opted to participate in the Medicaid program and receive federal matching funds, it must comply with all federal Medicaid requirements. (*Conlan v. Bonta* (2002) 102 Cal.App.4th 745, 753 [].)" (*Marquez*, *supra*, 240 Cal.App.4th at p. 93; accord *Abney v. State Dept. of Health Care Services* (2024) 99 Cal.App.5th 419, 423; *Dignity Health v. Local Initiative Health Care Authority of Los Angeles County* (2020) 44 Cal.App.5th 144, 151-152.) However, " '[t]he [Medicaid] program was designed to provide the states with a degree of flexibility in designing plans that meet their individual needs. [Citation.] As such, states are given considerable latitude in formulating the terms of their own medical assistance plans.' (*Addis v. Whitburn* (7th Cir. 1998) 153 F.3d 836, 840.) 'Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans.' [Citation.]" (*Olszewski*, *supra*, 30 Cal.4th at p. 810.)

In *Olszewski*, *supra*, 30 Cal.4th at page 810 et seq., our Supreme Court considered, "Medicaid statutes and regulations governing provider reimbursement and third party liability," and the respective duties of Medi-Cal and providers under these laws.

"Because 'Medicaid is essentially a pay[o]r of last resort' (*Rehabilitation Assn. of Virginia, Inc. v. Kozlowski* (4th Cir. 1994) 42 F.3d 1444, 1447), federal Medicaid law requires *state plans* to recover from liable third parties whenever possible. A ' "[t]*hird* party" ' is 'any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan.' (42 C.F.R. § 433.136.) *The state Medicaid agency* must 'take all reasonable measures to ascertain the legal liability of third parties . . . .' (42 U.S.C. § 1396a(a)(25)(A).) '[I]n any

15

case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency [must] seek reimbursement for such assistance to the extent of such legal liability . . . .' (42 U.S.C. § 1396a(a)(25)(B).)  To that end, the state plan must provide for the mandatory assignment of the beneficiary's rights 'to payment for medical care from any third party' *to the state agency*.  (42 U.S.C. § 1396k(a)(1)(A); see also 42 U.S.C. § 1396a(a)(45); 42 C.F.R. §§ 433.145, 433.146.)"  (*Olszewski*, *supra*, 30 Cal.4th at p. 811, all but second italics added.)

Under this scheme, "when a health care provider submits a Medicaid claim, *the state Medicaid agency* must first ascertain whether a third party may be liable.  '*If the agency has established the probable existence of third party liability* at the time the claim is filed, *the agency* must reject the claim and return it to the provider for a determination of the amount of liability . . . .  When the amount of liability is determined, the agency must then pay the claim to the extent that payment allowed under the agency's payment schedule exceeds the amount of the third party's payment.'  (42 C.F.R. § 433.139(b)(1).)" (*Olszewski*, *supra*, 30 Cal.4th at p. 811, italics added, fn. omitted.)  In contrast, " '[i]f the probable existence of third party liability cannot be established or third party benefits are not available to pay the recipient's medical expenses at the time the claim is filed, the agency must pay the full amount allowed under the agency's payment schedule.' (42 C.F.R. § 433.139(c).)  The agency must then pursue 'recovery of reimbursement' from that third party.  (42 C.F.R. § 433.139(d)(2).)"  (*Olszewski*, at pp. 811-812.)

Though, "federal law requires *the state Medicaid agency* to obtain full reimbursement of Medicaid payments whenever possible, *it strictly limits the ability of providers to obtain reimbursement for their services*.  Even though Medicaid payments are typically lower than the amounts normally charged by providers for their services (see *McAmis v. Wallace* (W.D.Va. 1997) 980 F. Supp. 181, 182), '[a] State plan must provide

16

that the Medicaid agency must limit participation in the Medicaid program to providers who accept, *as payment in full*, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual' (42 C.F.R. § 447.15, italics added).  Section 1396a(a)(25)(C) of title 42 United States Code Service then provides 'that in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service *may not seek to collect from the individual* (or any financially responsible relative or representative of that individual) payment of an amount for that service' except under specific circumstances and in limited amounts defined by the statute.  (Italics added; see also 42 C.F.R. § 447.20(a).)"  (*Olszewski*, *supra*, 30 Cal.4th at p. 812, first and second italics added, fns. omitted.)

To comply with federal requirements, California law has imposed certain limitations on provider reimbursement.  (See *Olszewski*, *supra*, 30 Cal.4th at p. 813.) Under Welfare and Institutions Code section 14019.3, subdivision (d), "payment received from the state in accordance with Medi-Cal fee structures shall constitute payment in full, except that a provider, after making a full refund to the department of any Medi-Cal payments received for services, may recover all provider fees to the extent that any other contractual entitlement, including, but not limited to, a private group or indemnification insurance program, is obligated to pay the charges for the care provided a beneficiary."

However, "[u]pon presentation of the Medi-Cal card or other proof of eligibility, a provider *shall* submit a Medi-Cal claim for reimbursement, subject to the rules and regulations of the Medi-Cal program."  (Welf. & Inst. Code § 14019.3, subd. (c).)

Additionally, "[a] provider of health care services who obtains a label or copy from the Medi-Cal card or other proof of eligibility pursuant to this chapter *shall not seek reimbursement* nor attempt to obtain payment for the cost of those covered health care services from the eligible applicant or recipient, or a person other than the department or

17

a third-party payor *who provides a contractual or legal entitlement to health care services*." (Welf. & Inst. Code, § 14019.4, subd. (a), italics added.)

In *Palumbo*, the court considered whether a tortfeasor might be considered a " 'third party pay[o]r,' . . . who 'provides' health care services." The court found, " '[p]rovides,' in this statutory context, denotes an existing and ongoing supplier of health care services, such as a health insurer. It does not describe a third party tortfeasor who provides nothing in the way of health care services, but of whom it can only be said *may become liable* to compensate an injured party for past and/or future medical expenses. The tortfeasor is a pay[o]r, but not a provider." (*Palumbo, supra,* 149 Cal.App.3d at p. 1031, italics added, fn. omitted.)

Similarly, here, a UM insurer may eventually prove to be liable to compensate an injured party (or Medi-Cal by assignment) for medical expenses paid. But it does not provide a contractual or legal entitlement to healthcare under *Palumbo*.

"The word 'shall' in ordinary usage means 'must' and is inconsistent with the concept of discretion." (*People v. Mun. Court (hinton)* (1983) 149 Cal.App.3d 951, 954.) Thus, under California law once a patient presents proof of Medi-Cal coverage to a provider the following is true: The provider must submit a claim to Medi-Cal for reimbursement. (Welf. & Inst. Code § 14019.3, subd. (c).) The provider must not seek to obtain payment for services provided from "the eligible applicant or recipient, or a person other than the department or a third-party payor *who provides a contractual or legal entitlement to health care services*." (Welf. & Inst. Code, § 14019.4.) A UM insurer is not a provider of a contractual or legal entitlement to health care services. (See *Palumbo, supra*, 149 Cal.App.3d at p. 1031.) DHCS then has the authority to pursue potential payments from potentially liable third parties, like UM. (See *Olszewski, supra*, 30 Cal.4th at p. 811.) To the extent a Medi-Cal beneficiary might expect to be required to assign UM benefits under the law, that assignment is made to Medi-Cal, not the provider. (42 U.S.C. § 1396k(a)(1)(A).)

That is, contrary to Dameron's reliance on nonCalifornia authorities to argue that a Medicaid provider can "seek not to bill Medicaid in the first place" and "remains free to seek its entire customary fee from responsible third parties," under laws that govern the provision of Medi-Cal services in California, providers do not have the authority to ignore a patient's Medi-Cal coverage and instead seek full payment—i.e., payment above Medi-Cal rates—from UM insurance. To the extent UM insurance may be required to cover expenses, it is not for the provider to make that determination. It is not within the reasonable expectation of the UM insureds who receive medical care through a Medi-Cal plan that a standard hospital admissions form will cause them to (1) assign their UM benefits to pay a hospital bill at above Medi-Cal rates; (2) without Medi-Cal ever being notified of a potential claim; and (3) before the extent of the UM insurer's obligation to cover the patients damages (if the obligation exists at all) has been determined.

Dameron's reliance on various statutes and guidelines governing how *Medi-Cal* is supposed to manage its obligation as a payor of last resort do not help Dameron. For example, Welfare and Institutions Code section 14124.795 discusses Medi-Cal's obligation to work with carriers—including carriers of UM insurance—to identify instances in which "Medi-Cal benefits *were provided to a beneficiary* because of an injury for which another person is liable, or for which a carrier is liable in accordance with the provisions of any policy of insurance." (Italics added, See also Welf. & Inst. Code, § 14124.70, subd. (a).) Section 433.139, subdivision (b)(1), of title 42 of the Federal Code of Regulations identifies the obligation of a Medicaid agency if it, "has established the probable existence of third party liability at the time the claim is filed, [to] reject the claim and return it to the provider for a determination of the amount of liability. The establishment of third party liability takes place when the agency receives confirmation from the provider or a third party resource indicating the extent of third party liability." Notably, both provisions speak to what a *state agency* must do (1) to identify possibly liable third parties once a claim has been filed; and (2) to seek to have

19

the third party pay for the care. They do not mandate, or create an expectation, that a provider will take it upon itself to ignore the existence of Medi-Cal coverage, never bother submitting a claim to Medi-Cal for care provided, wait for it to be decided that a UM provider is obligated to make a payment to the patient under the policy, then demand that UM insurer pay their full bill. The law does not exist so hospitals can reap higher payments from the capped resources of financially and physically vulnerable patients.

In short, under the laws governing Medi-Cal, Dameron's use of the AOB to claim a right to payment of its full bill from UM coverage was neither required nor reasonably expected when M.G. or her representative signed the COA.

### 3. The UM Policy Itself did not Create a Reasonable Expectation of Payment of Medical Bills

In its opening brief, Dameron cites to a section of Progressive's description of UM coverage in which it states it will, "pay for damages that an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle . . . because of bodily injury: [¶] 1. sustained by an insured person; [¶] 2. caused by an accident; and [¶] 3. arising out of the ownership, maintenance, or use of an uninsured motor vehicle . . . ." Dameron argues that because M.G. would have been entitled to recover her medical bills against the uninsured driver, her Progressive coverage also provided coverage for her medical bills.

It may be true that M.G. would have expected UM coverage to pay some of her medical bills, particularly any copays she might have made or any amount assigned to Medi-Cal for the amount Medi-Cal paid. However, this language did not create a reasonable expectation that Dameron would use an AOB in its COA to collect its full hospital bill from M.G.'s capped first-party UM coverage—which was also to serve to cover her lost wages, pain and suffering, and other damages—without ever submitting a

20

claim to Medi-Cal, as it was required to do when M.G. presented evidence of Medi-Cal coverage.

## III

### *Dameron's Miscellaneous Other Arguments*

In its briefing, Dameron makes a variety of other arguments in an effort to persuade this court that the trial court erred.

Dameron argues it was denied ample opportunity to respond to authorities cited in Progressive's reply in the trial court and the trial court's ruling on the demurrer. Dameron argues this denied it due process regarding three issues.

First, Dameron argues it lacked a meaningful opportunity to make an argument about the applicability of Knox-Keene. As we have found that the trial court properly sustained the demurrer under laws governing contracts of adhesion, and we need not consider Knox-Keene to affirm this judgment, this issue has no impact on the result of this case. Moreover, our decision in *Dameron v. AAA*, *supra*, 77 Cal.App.5th at pages 984-985 discusses the import of Knox-Keene at length, and that decision was central to all the briefing regarding the demurrer. Indeed, Dameron argued Knox-Keene does not control here given M.G. had Medi-Cal.

Second, Dameron argues it was not given sufficient opportunity to respond to Progressive's argument that Medi-Cal insureds only need to present evidence of Medi-Cal coverage and then Dameron must bill Medi-Cal.

Third, Dameron claims it was not given adequate opportunity to respond to Progressive's arguments regarding M.G.'s assignment of benefits to Medi-Cal. But these arguments were fair responses to Dameron's opposition arguments regarding primary payors and that Medi-Cal laws required Dameron to bill Progressive. In reply briefs, parties may "may cite new authorities in support of arguments properly raised in the opening brief," and "rebut arguments made by the respondent in respondent's brief."

(*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 276.) Progressive's actions were permissible. Similarly, to the extent the trial court relied on authorities not cited by the parties to address the parties' arguments, these authorities were related to issues raised in the parties' briefs—i.e., the application of *Dameron v. AAA* to patients' with Medi-Cal—and the court gave Dameron a fair chance to address any possible authorities it cited by providing a tentative ruling.

In its opening brief, Dameron argues that *Olszewski* and *Palumbo* do not control this case because of the different fact patterns under which those cases arose. As indicated by our citation to those cases above, even though not directly on point, we find some of the reasoning of the two cases instructive and persuasive here. And we certainly find them more persuasive than the nonCalifornia case law Dameron has relied on to argue it can pursue UM coverage *instead of* Medi-Cal payments.

Dameron also argues generally that public policy supports its efforts to collect from M.G.'s UM coverage. But public policy is not relevant when Dameron's actions violate the law.

Given that we find that the AOBs at issue here, particularly as Dameron used them here, contained unenforceable assignments of UM benefits to Dameron, we find the remainder of the arguments in the opening brief regarding Progressive's liability to Dameron and the extent of that liability unavailing.

Finally, to the extent any of Dameron's arguments rely on the notion that, as a policy, Progressive will also refuse to honor Dameron's requests to collect for medical bills from Med Pay coverage retained by Medi-Cal recipients, we agree with the trial court's assessment that these situations are purely theoretical at this point, as the operative complaint does not identify a single particular patient treated by Dameron who (1) was covered by Medi-Cal or uninsured; (2) had Med-Pay coverage with Progressive; and (3) for whom Progressive refused to pay medical bills. Moreover, in introductory statements contained in its opening brief, Dameron states this case is distinguishable from

22

*Dameron v. AAA* in part because it involves a patient that had "no Med-Pay" coverage. Also, none of the headers Dameron uses in its opening brief specifically mention Med-Pay coverage.

## DISPOSITION

The ruling sustaining the demurrer and the judgment is affirmed.  Pursuant to California Rules of Court, rule 8.278(a)(2) Dameron shall pay Progressive's costs on appeal.

_____

HULL, Acting P. J.

We concur:

_____

DUARTE, J.

_____

WISEMAN, J.*

_____

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.